Good afternoon your honors. My name is Rocky Cole and I represent Mr. Cobo-Cobo. There's two issues in this particular case, the consent to get into the home and the seizure that occurred on the couch. I would like to spend the bulk of my time on the seizure. The big picture in this case is that this case did not begin as an immigration related case. These two officers, Agent Fishels and Agels Lund, were providing supplemental assistance to the Cedar Rapids Police Department in a investigation. Counsel, I couldn't hear what issue you said you're concentrating on. The seizure issue, your honor. I'm sorry. The seizure on the couch. Counsel, if you'd like to raise the podium, you could get the microphone closer to you. For once, I can't be heard. I'll speak louder. I'd like to spend the bulk of my time on the This case began not as an immigration case. Mr. Cobo-Cobo was not under any investigation for any wrongdoing whatsoever in 2011. Instead, it was related to essentially supplemental assistance on a stabbing investigation. The officers in this case located a vehicle. They thought it perhaps matched the suspect involved in the investigation. They stopped the vehicle, determined that the documentation, and arrested him for immigration violation. It became an immigration case on the scene. It became an immigration case on the scene related to Mr. Mendoza only. The DHS officers were assisting Cedar Rapids Police Department, but once the driver and had no immigration papers, their own jurisdiction authority and concerns took over. Absolutely, your honor. But the point is, even at that point, they had no reason to think that the remaining people or anyone who lived in the same apartment that Mr. Mendoza did were in violation of immigration law. So that is correct. As to Mr. Mendoza, that's true. But you're suggesting they shouldn't have been in the apartment. Well, you haven't gotten their argument there. That is something we argued below, your honor. The issue there was that they said that they were going to give him additional time to retrieve some personal items. The point is, though, is that at the time it became the immigration investigation, your honor, they were also quite clear that they had identified that this guy was not the actual suspect. So they were retrieving personal items. At the time, this is critical, your honor, Mr. Cobo-Cobo was asleep. They had no evidence whatsoever that he was in violation of the law. And here, normally I don't like to spend time reading from a transcript, but I would direct the court's attention to the hearing transcript, page 37, lines 10 through 22. The important part of that is that prior to the time that Mr. Cobo-Cobo was ordered on the couch, they had no evidence whatsoever that he was in violation of immigration laws. Zero. It was clearly a seizure. Now, after the fact, they talked about what was the basis to detain him. They said the fact that he spoke Spanish, that he looked Latino. Agent Lund said the fact that he had soccer flags on was one factor that they looked at, that that meant he possibly was a foreigner. And the third thing is, is that he lived in the same location as Elias Mendoza in this particular case. And that we would argue is not sufficient to detain. There was not grounds to seize a sleeping individual on the basis of his national origin or Spanish-speaking ability alone. And I think... What case applying immigration law detention, stop and detention standards support that assertion? The case that directly supports that assertion, Your Honor, is that, well, it's not, this is a criminal case. I'd say the strongest assertion is the 1975 Brignone case, which also talks about the weight that you can plate on national origin. And there, they said that in a criminal investigation, national origin alone is not sufficient. At some point, they say that there may be a set of factors in which they could take that into consideration. And I believe that they there was no evidence whatsoever that he had violated the immigration law at that point. Zero. And so I think that the question is, is that if you already have, Your Honor, evidence that someone may be violating the immigration law, I think at that point then, yes, there could be a circumstance where you'd say, okay, given the fact that we already have some evidence, we may be able to place some weight on that. But this case began essentially in this And that's not enough. I would direct the Court's attention to the Manzo case, and it is a Ninth Circuit case, 457 F3rd 928. And at least in the Ninth Circuit, they were quite clear that national origin in Spanish-speaking should, the officer should be very careful if they're going to use that. The Court below talked about an Eighth Circuit case in which they indicate that in 23rd F3rd 1331 that it can be used as a factor. And I would just note, if the Court isn't going to rely on Manzo, I would request that, you know, that be clear in terms of whether there's a conflict. So I think the issue is, is that if the Court finds that there are not reasonable grounds to detain, it should throw out the statement of alienage. It should suppress the A file. It should remand the case back down below. This case arose as a conditional guilty plea. And what the Court should do then, Judge Reed did not address the inevitable discovery. But wait a minute, counsel, you're on the remedies, assuming you win. Why don't safety concerns warrant putting everyone on the couch? Because there was no evidence whatsoever that was the purpose that they ordered them down on the couch, Your Honor. They didn't frisk them. This was years after the fact, right? Government doesn't have to present evidence. Well, the 2011 investigation, Your Honor, there was no evidence whatsoever that I think that they do, Your Honor, under Terry, to be able to stop and frisk and detain someone on that basis. They have to have a reasonable, articulable suspicion that the person presents. I thought about Mueller, you know, and the other other Supreme Court cases on safety and segregating detained people. In order for them to do that, Your Honor, I think that they do need a suspicion that in fact that they are armed. And there was none in this case. There was no indication that Mr. Endoza had an arm, that he was involved in the actual stabbing incident. And that was an unsupported assertion below that there was any reason to detain. But counsel, you don't have to have a specific decision on everyone in a room or a home if there are safety concerns as to one of the people there. I don't know that there was as the Mr. Mendoza, Your Honor. There was nothing whatsoever to suggest that he posed a safety risk. He had been cleared of the stabbing investigation and he had no weapon on his person. He was just undocumented. So what about the cases that say if you, you know, if you're if you're going into a home to arrest someone, you are allowed to do a sweep and bring everybody out of bedrooms and closets and whatnot and put them in a central place while you complete the arrest. I don't think that that I think that still has to be supported. I don't I don't read the case law, Your Honor, that you can do a total sweep without any evidence whatsoever that any of the occupants pose a threat. The other piece of it is, is they could have arrested him on the spot and brought him back, but instead they accommodated him to do the to get some personal items. So nothing about inside the house authorized them to detain. And for the authority on that, I would just rely on Terry, Your Honor. I have a minute left on my rebuttal that I'd like to counsel. May it please the court. I'm Dan Tweed. I'm representing the United States in this case. This case is really broken down into two parts. As you've seen, we have the 2011 incident, and that's where the officers encounter Mr Mendoza and their investigation into a stabbing incident. It turns into an immigration case when they find out that he is here illegally from they allow him to go into his residence. They're going to stay at his elbow to make sure that they maintain the integrity of the arrest to make sure he doesn't get access to anything dangerous that could harm them when they're inside the residence. They for safety purposes, as the officers testified, they asked everyone to come forward into the living room so that they could make sure that there was nobody elsewhere that caused them any injury or harm. They were a stabbing, so not only did they ask that the people there identify themselves and they were able to rule out the fact that they were not the name that they were looking for, they were also developing suspicion that the people there were there illegally in this country. It was not just based upon their appearance. In fact, Agent Lund said he didn't put any weight on the Hispanic appearance of the individuals. What they said was that the situation showed that Mr Mendoza had no identification. He was undocumented and they found out that he was illegal. They said that when they asked for identification of those people inside the residence, no government issued identification. Again, this would lend them to believe that these were undocumented aliens. No one spoke English. Again, as they testified, this would lend them to believe that these people were there for a short period of time because they haven't picked up the English language. They also determined that the four individuals are all males, unrelated, roughly the same age. They had found that this also leads them to the suspicion that these people were in the country illegally, or at least for a short period of time. Again, no proof of identification. They saw the indicia of foreign sports. This also led them to believe that they were not necessarily born or raised here in the United States. After they had all that suspicion, then they asked for the question, are they here illegally? There was nothing wrong with this procedure. They had reasonable suspicion to place them in the couch, ask them additional questions regarding their investigation, make sure they were safe. Then during that, the suspicion arose. Judge Reed found that all that was fine, that there was no violations there. What we really get to then is the second phase of this investigation. The government was not relying upon the first phase. We heard that Justin Osterberg, the deportation officer, in December of 2015, four years later, receives an email that shows that the defendant is using social security numbers to register a car. This triggers the investigation. He takes the steps to follow up on that email, contacts the Iowa Department of Transportation to determine whether or not other vehicles are being registered by the defendant under that development, and determines from Iowa Workforce Development that there are three locations where this defendant, or that name, is being used to work using that social security number. Now, Judge Reed said she didn't need to find the Inevitable Discovery Doctrine to apply, but it really does. She said, I don't need to reach it because the A file and the identification card from an employer was lawfully seized and placed in the A file. But whether or not they had that identification card from Carlson Building Maintenance, they would have found Carlson Building Maintenance as an employer where the defendant was using the social security number. Why is that? Because when he contacted Iowa Workforce Development, he was given three employers, one of whom was Carlson Building Maintenance. And in fact, the Carlson Building Maintenance I-9 form was completed in 2015. We're not even talking about an I-9 form that was completed at the time that the original identification card was seized. We have a name that he follows up with all of the companies. So whether he had that card before or after, he followed up with the names that were on the Iowa Workforce Development. He would have come across that I-9, as he testified, if he hadn't already contacted them. There was no reason to contact them twice. He already had that information. So he had this independent line of discovery. He didn't even know, well, there was nothing about that initial seizure. It's not even a case where the discovery was inevitable. It was, in fact, discovered. It was discovered. But even if they didn't have the card, though, is what I'm saying, he would have discovered it. It wasn't that, okay, well, we would have. But in fact, he did. He did. Except he actually found it before. He called Carlson Building Maintenance before he got the list of three names from Iowa Workforce Development. So he would, even though he already had the I-9 form. Well, how did he know to do that? He called Carlson. He was trying to see where else this person may have been using the Social Security number. So if they're using it to register cars, he's probably got a job. They contact Iowa Workforce Development. Are there any employers listing this number? He got it from Iowa Workforce Development. Iowa Workforce Development. And that's where he got Carlson. And the Carlson name was listed. Cancun, Carlson Building Maintenance in the third location. And so he contacted everyone on that list. But since he'd already contacted Carlson to begin with, he didn't need to contact them again. Why did he contact Iowa Workforce? He's trying to see if this Social Security number is being used to work. That's a clearinghouse kind of thing? It's a clearinghouse thing where you can call for law enforcement to figure out where people are employed if they have a number. They had a name, number, and that came back. I appreciate that clarification. It's a very good question. The court did not err in denying the motion to suppress. We would just ask the court to uphold the conviction, either on the basis of the judge's decision or on inevitable discovery. Another ground that was raised, briefed, presented, and the magistrate judge found it sufficient for inevitable discovery. The district judge didn't reach the issue? Judge said I don't need to reach that decision because the first ground of the seizure in 2011 was fine. We don't have to either if we decide the case on the other ground. That's correct. But we could if we didn't. Correct. Even though the district court did not. Correct. Thank you. Counsel, you have a little over a minute. I would just ask to the inevitable discovery doctrine, the agent testified at the detention hearing that, in fact, this investigation began with a routine review of the immigration file during a reorganization. And that's what led to the investigation. At the second hearing, then he said, oh, whoops, I had forgotten, which is okay. We all forget things from time to time. And then he did it at a, it was another email that, that was a live issue in terms of fruit of the poisonous tree. Factual question. Factual question that I think the court should remand it back to the judge to, to, to, to reconcile those, those, those issues. The other thing is, is asked to the seizure. This arose in the context of a conditional guilty plea. You know, if I go to trial on this matter, your honor, and not having admission that you're in the country illegal, not having the a file, not having at least the card that was found in a file, that's a different case. So that's why I'd ask the court to allow us to suppress all that evidence, remand, and then, and then allow us to withdraw the guilty plea because that's how this arose. Thank you, your honor. Thank you. Counsel cases submitted.